UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DENNIS DELMAR LINCOLN,

    Petitioner,

v.                                                 Case No. 2:06-cv-307
                                                 HON. ROBERT HOLMES BELL

DAVE BERGH,

    Respondent.

_____/

## REPORT AND RECOMMENDATION

Petitioner Dennis Delmar Lincoln filed this petition for writ of habeas corpus challenging the validity of his convictions for five counts of second degree murder, five counts of armed robbery, five counts of felony murder, felon in possession of a firearm, and possession of a firearm during the commission of a felony. Petitioner was convicted by a jury and was sentenced to life imprisonment without parole on the murder convictions, 42 months to 90 months imprisonment on the felon in possession of a firearm conviction, and a two year term of imprisonment on the felony firearm possession conviction. Petitioner maintains that his convictions were obtained in violation of his federal rights. The respondent has filed an answer and has complied with Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts. The parties have briefed the issues and the matter is now ready for decision. In accordance with 28 U.S.C. § 636(b), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, I am recommending that this petition for writ of habeas corpus be denied.

This case involves the murder of jewelry store owner Marco Pesce and his three young children and his mother, as part of a robbery scheme planned by petitioner and his co-defendant. Petitioner has raised the following issues in his petition:

> I. The incriminating statements made by petitioner were obtained in violation of the Sixth Amendment.
>
> II. The trial court erred in admitting coerced statements that violated petitioner's Fifth and Fourteenth Amendment rights.

In April of 1996, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) became effective. Because this petition was filed after the effective date of the AEDPA, this Court must follow the standard of review established in that statute. Pursuant to the AEDPA, an application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This provision marks a "significant change" and prevents the district court from looking to lower federal court decisions in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). To justify a grant of habeas corpus relief under this provision of the AEDPA, a federal court must find a violation of law "clearly established" by holdings of the Supreme Court, as opposed to its dicta, as of the time of the relevant state court decision. *Williams*

*v. Taylor*, 529 U.S. 362, 412 (2000). Recently, the Supreme Court held that a decision of the state court is "contrary to" such clearly established federal law "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Id.* A state court decision will be deemed an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 412. Rather, the application must also be "unreasonable." *Id.* Further, the habeas court should not transform the inquiry into a subjective one by inquiring whether all reasonable jurists would agree that the application by the state court was unreasonable. *Id.* at 410 (disavowing *Drinkard v. Johnson*, 97 F.3d 751, 769 (5th Cir. 1996)). Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 409.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy,* 160 F.3d 1131, 1134 (6th Cir. 1998). The habeas corpus statute has long provided that the factual findings of the state courts, made after a hearing, are entitled to a presumption of correctness. This presumption has always been accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989), *cert. denied*, 495 U.S. 961 (1990). Under the AEDPA, a determination of a factual issue made by a state court is presumed to be correct. The petitioner has the burden of rebutting the presumption

of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998), *cert. denied*, 527 U.S. 1040 (1999).

Petitioner asserts that his Sixth Amendment right to counsel was violated during the police interview and that the trial court erred by failing to suppress the statements petitioner made outside the presence of an attorney. The Michigan Court of Appeals rejected this claim, explaining that petitioner never invoked a request for an attorney despite the reading of *Miranda* warnings. The court stated:

> Defendant contends that he effectively invoked his right to counsel at arraignment because the arraigning judge failed to advise him at arraignment that he had the right to a court appointed lawyer if he could not afford one, failed to inquire regarding defendant's financial status, and failed to ask defendant if he wanted an attorney appointed for him in violation of MCR 6.005(A) and MCR 6.104(E)(3). According to defendant, his arraignment should be treated as an invocation of his right to counsel because he would have invoked his right to counsel at that time if the trial court had properly complied with MCR 6.005(a) and MCR 6.104(E)(3). We reject this argument. "[T]he [Sixth Amendment right to counsel] is invoked *only* by requesting counsel, usually at postcharge questioning or at arraignment." *People v Anderson (After Remand)*, 446 Mich 392, 402; 521 NW2d 538 (1994) (emphasis added). At his arraignment, defendant did not assert or invoke his right to counsel.
>
> Our review of the record supports defendant's contention that the arraigning judge did not strictly adhere to MCR 6.005(A) and MCR 6.104(E)(3) in advising defendant of his rights. However, the trial court's conduct does not require reversal of defendant's convictions because it was harmless for two reasons. *McPherson, supra* at 131; MCL 769.26; MCR 2.613(A). First, the arraignment was not a critical stage of the proceedings in this case because defendant was not questioned, did not plead guilty, and did not waive any defenses. See *People v Green*, 260 Mich App 392, 400; 677 NW2d 363 (2004). The arraigning judge simply read the charges against defendant, then stated that he was accepting defendant's not guilty plea without even asking defendant on the record about his plea. Under these circumstances, defendant's arraignment, unlike a trial, was not a proceeding at which defendant required a great deal of aid in coping

with legal problems or assistance in meeting his adversary. *Patterson v Illinois*, 487 US 285, 298; 108 S Ct 2389; 101 L Ed 2d 261 (1988); *id.*

Second, defendant's Sixth Amendment rights were adequately protected post-interrogation. The police had advised defendant of his *Miranda* rights when they first interviewed or questioned him on December 25, 2002, before he was arraigned. At that time, defendant placed his initials next to each of the five rights to indicate that he understood the rights. While the police did not again read defendant his *Miranda* rights when they interviewed him after he was arraigned, they informed him that the rights they had advised him of the previous day were still in place and asked him if he understood his rights. Defendant indicated that he understood his rights and that he wished to speak to the police. Moreover, defendant was again advised of his *Miranda* rights before he signed his written statement and again waived his right to have counsel present. An accused who is advised of his *Miranda* rights "has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one." *Patterson, supra* 487 US at 296. Therefore, because defendant affirmed that he understood his *Miranda* rights and that he wanted to continue talking to the police, his waiver of his Sixth Amendment rights at the post-arraignment interrogation was both knowingly and intelligently made.

Furthermore, we reject defendant's contention that the police were prohibited from initiating an interrogation of defendant after his arraignment. Defendant is correct that the police cannot initiate interrogation of the defendant if a defendant asserts his Sixth Amendment right to counsel at his arraignment. *Anderson, supra* at 402-403. However, because defendant did not invoke his Sixth Amendment right to counsel at his arraignment, the police were not prohibited from initiating an interrogation of defendant after defendant's arraignment provided that they obtained a valid waiver of defendant's Fifth and Sixth Amendment rights to counsel before the post-arraignment interrogation. *Id.*

The fact that the trial court may have appointed counsel for defendant or that defendant's mother may have retained counsel for defendant before the police interrogation does not render improper the conduct of the police in initiating the interrogation with defendant after his arraignment for two reasons. First, the arraigning judge did not indicate on the record that he intended to appoint counsel for

defendant, so the police were not on notice that counsel had been appointed. There is absolutely no indication from the record that the police deliberately set out to obtain information from defendant by intentionally violating his constitutional rights. To the contrary, the record reveals that the police, at every step of their interrogation of defendant, scrupulously honored his rights. Second, and more importantly, the police did not improperly initiate the interrogation because the rationale for the rule prohibiting the police from initiating a post-arraignment interrogation of a defendant who has requested counsel is to protect a defendant who has expressed a desire to deal with the police only through counsel. *Id.*, 487 US at 291. The record does not indicate that defendant was aware that his mother had retained counsel for him or that he was aware of and had accepted appointed counsel. Most importantly, defendant himself was completely willing to speak to the police and had not previously "'asked for the help of a lawyer' in dealing with the police." *Id.*, quoting *Jackson, supra*, 475 US at 631, 633-635. "[O]nce 'an accused . . . ha[s] expressed his desire to deal with the police only through counsel' he should 'not [be] subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication.'" *Id.*, quoting *Edward v Arizona*, 451 US 477, 484-485; 101 S Ct 1880; 68 L Ed 2d 378 (1981). In this case, defendant did not invoke his right to counsel at arraignment and he never expressed his desire to deal with the police only through counsel. Defendant clearly willingly spoke to the police post-arraignment after being advised that his rights were in place. Because defendant knowingly and intelligently waived his rights prior to and during all his conversations with the police, all of his statements were admissible.

The United States Supreme Court recently explained the longstanding rule that after a suspect in a custodial interrogation is advised of his right to an attorney, the questioning must stop outside the presence of petitioner's counsel, if the right is invoked. *Montejo v. Louisiana*, 556 U.S. ___ (2009). The court overruled the holding in *Michigan v. Jackson,* 475 U.S. 625 (1986), which held that once counsel is requested at an arraignment or similar proceeding, a defendant's subsequent waiver of counsel during a police interrogation is invalid. The Court explained:

What does the *Jackson* rule actually achieve by way of preventing unconstitutional conduct? Recall that the purpose of the rule is to preclude the State from badgering defendants into waiving their previously asserted rights. See *Harvey, supra*, at 350; see also *McNeil*, 501 U.S., at 177. The effect of this badgering might be to coerce a waiver, which would render the subsequent interrogation a violation of the Sixth Amendment. See *Massiah, supra*, at 204. Even though involuntary waivers are invalid even apart from *Jackson*, see *Patterson*, 487 U.S., at 292, n. 4, mistakes are of course possible when courts conduct case-by-case voluntariness review. A bright-line rule like that adopted in *Jackson* ensures that no fruits of interrogations made possible by badgering-induced involuntary waivers are every erroneously admitted at trial.

But without *Jackson*, how many would be? The answer is few if any. The principal reason is that the Court has already taken substantial other, overlapping measures toward the same end. Under *Miranda*'s prophylactic protection of the right against compelled self-incrimination, any suspect subject to custodial interrogation has the right to have a lawyer present if he so requests, and to be advised of that right. 384 U.S., at 474. Under *Edwards*' prophylactic protection of the *Miranda* right, once such a defendant "has invoked his right to have counsel present," interrogation must stop. 451 U.S., at 484. And under *Minnick*'s prophylactic protection of the *Edwards* right, no subsequent interrogation may take place until counsel is present, "whether or not the accused has consulted with his attorney." 498 U.S., at 153.

These three layers of prophylaxis are sufficient. Under the *Miranda-Edwards-Minnick* line of cases (which is not in doubt), a defendant who does not want to speak to the police without counsel present need only say as much when he is first approached and given the *Miranda* warnings. At that point, not only must the immediate contact end, but "badgering" by later requests is prohibited.

Petitioner never invoked his right to counsel. Petitioner argues that if he had been arraigned properly under the Michigan Court Rules he would have exercised his right to an attorney. Clearly, that is speculation and hindsight. Petitioner was an experienced criminal defendant and had knowledge of *Miranda* rights and the right to an attorney. Petitioner consistently waived his right to an attorney prior to police questioning. Petitioner's assertion that he would have requested an

attorney at arraignment if offered does not afford petitioner any relief because he never actually made

a request for an attorney as required under the *Montejo* analysis.

Petitioner claims that the statements he made were involuntary. The Michigan Court of Appeals rejected that claim stating:

> Defendant argues that the trial court erred in refusing to suppress statements he made to the police both before and after he was arraigned because his statements were involuntary because the police engaged in coercive behavior to obtain the statements. Therefore, according to defendant, the police violated his rights under the Fifth and Fourteenth Amendments, and the statements should have been suppressed.
>
> The Fifth Amendment of the United States Constitution guarantees that the government cannot compel a defendant in a criminal case to testify against himself. US Const, Am V. This protection has been applied to the states through the Due Process Clause of the Fourteenth Amendment. *People v Cheatham*, 453 Mich 1, 9; 551 NW2d 355 (1996). Whether a statement is deemed voluntary under the Fourteenth Amendment is to be determined using a totality of the circumstances analysis. *People v Cipriano*, 431 Mich 315, 333-334; 429 NW2d 781 (1988). The question is whether "the confession is 'the product of an essentially free and unconstrained choice by its maker,' or whether the accused's 'will has been overborne and his capacity for self-determination critically impaired . . . .'" *Id*. at 334, quoting *Culombe v Connecticut*, 367 US 568, 602; 81 S Ct 1860; 6 L Ed 2d 1037 (1961). The trial court should consider the following non-exclusive factors in determining whether a statement is voluntary:
>
>> the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was

> deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse. [*Id*.]
>
> The voluntariness of a confession is a question for the trial court; an appellate court must examine the entire record and make an independent determination of voluntariness. *People v Robinson*, 386 Mich 551, 558; 194 NW2d 709 (1972). An appellate court will not reverse a trial court's findings unless they were clearly erroneous. *People v DeLisle*, 183 Mich App 713, 719; 455 NW2d 401 (1990). A finding is clearly erroneous if this Court is left with a definite and firm conviction that a mistake has been made. *Id*.
>
> Coercive police activity is a necessary predicate to finding that a confession is not voluntary under the Fourteenth Amendment Due Process Clause. *Colorado v Connelly*, 479 US 157, 164-165; 107 S Ct 515; 93 L Ed 2d 473 (1986); *People v Fike*, 228 Mich App 178, 182; 577 NW2d 903 (1998). The same standard applies to the Fifth Amendment privilege against self-incrimination. *Cheatham, supra* at 14. After thoroughly examining the entire record, we are not left with a definite and firm conviction that the trial court made a mistake in finding defendant's statements to be voluntary and not coerced. The record simply does not support defendant's contention that the police engaged in coercive conduct that overcame defendant's will and rendered his statements involuntary.

The Fifth Amendment to the United States Constitution provides that, "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Supreme Court has characterized this right as an "essential mainstay of our adversary system," *Miranda v. Arizona*, 384 U.S. 436, 460 (1966), and inherent in this right is the individual's "right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will.'" *Id.* (quoting *Malloy v. Hogan*, 378 U.S. 1, 8 (1964)). The Court has further held that inherent in the privilege against self- incrimination is the right to an attorney. *Id.* at 444. A defendant may waive these rights, provided the waiver is made "voluntarily, knowingly and intelligently." *Id.*

In determining whether a waiver of these rights is valid, the Supreme Court has identified two requirements: First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that *Miranda* rights have been waived. *Moran v. Burbine,* 475 U.S. 412, 421 (1986).

The ultimate issue of the voluntariness of a confession is a legal question requiring independent federal determination. *See Arizona v. Fulminante*, 499 U.S. 279, 286-287 (1991); *Miller v. Fenton*, 474 U.S. 104, 112 (1985). However, the subsidiary factual issues are entitled to the § 2254(d) presumption. *Id.* Accordingly, the trial court's findings of fact are governed by the presumption of § 2254 where fairly supported by the record. *See e.g. Sumner v. Mata*, 455 U.S. 591 (1982); *Strickland v. Washington*, 466 U.S. 668 (1984). Based upon these facts, the court must make an independent determination whether the findings "add up" to coercion. *Miller*, 474 U.S. at 112; *see also Cooper v. Scroggy*, 845 F.2d 1385, 1390 (6th Cir. 1988).

Lieutenant McDermott of the Livonia Police Detective Bureau interviewed petitioner on December 25, after petitioner's arrest. Petitioner was advised of his *Miranda* rights. Petitioner signed the form indicating that he was advised of his *Miranda* rights, and that he understood those rights. Petitioner was 27 years old at the time and a high school graduate who had attended college. Petitioner gave an oral statement to the lieutenant. Petitioner did not appear in distress or on medication, and no promises were made in exchange for his statement. Prior to giving his statement

petitioner was aware that he had been arrested for five counts of homicide. Petitioner initially made a statement that on the day of the murders he was at home in Flint. When he found out that he did not have to work that day he drove to Detroit and went to the Copa Lounge, a bar owned by his co-defendant's uncle. He stayed at the bar with his co-defendant until about 6:00 p.m. Petitioner claimed that he left the bar and went back to Flint to visit his uncle for about one hour and then he went home. Petitioner claimed that he had not spoken to his co-defendant since he had left the bar that evening. The interview lasted 32 minutes.

After investigating petitioner's statement, Lieutenant McDermott quickly discovered that petitioner gave a false story. A bartender at the Copa Lounge stated that petitioner was not at the bar that evening. Petitioner's uncle stated that petitioner did not visit him that evening and petitioner's brother indicated that petitioner's statement about going home that evening was false.

When Lieutenant McDermott confronted petitioner, petitioner indicated that he would not change his story. Lieutenant McDermott asked petitioner if he would be surprised if his co-defendant, John Wolfenbarger, had stated that petitioner was involved in the killings and at the home during the shootings. Petitioner then denied that he had killed anyone. In fact, when Lieutenant McDermott made that representation to petitioner, co-defendant Wolfenbarger had not implicated petitioner. This second interview lasted about 10 minutes. Prior to the second interview, Lieutenant McDermott informed petitioner that his rights were still in place, and petitioner indicated that he understood his rights. Sergeant Goralski then talked to petitioner for about 10 to 12 minutes. Sergeant Goralski asked petitioner if he was not the shooter, who was the shooter? Petitioner indicated that he was not the shooter and that he could not talk about it. There was no further discussion that day.

The next day, Lieutenant McDermott brought petitioner into the interview room. Petitioner indicated that he was aware of his rights and knew that he could "lawyer up," but did not wish to have a lawyer present. Petitioner stated, "I didn't kill Diane's babies." Petitioner indicated that he had been reading about the crime in the newspaper. The interview stopped because petitioner was to be arraigned on a warrant. Lieutenant McDermott was aware that petitioner had not asked for an attorney. Lieutenant McDermott and Sergeant Goralski decided to both talk to petitioner that evening. The officers told petitioner they knew he had been arraigned on the charges and that the judge had read petitioner his rights. The officers explained to petitioner that the same rights applied that had been previously read to petitioner. Petitioner indicated that he understood his rights and that he would continue to speak with the officers. The officers discussed different levels of culpability with petitioner. Petitioner indicated that he had some level of culpability in the crimes. Petitioner indicated that he was fearful of his co-defendant and co-defendant's uncle, Billy Smith. The officers told petitioner that co-defendant Wolfenbarger was not talking and that Smith would testify on behalf of the prosecution. Petitioner indicated that he was involved in the crime.

During the interview, an attorney arrived to speak with petitioner. The attorney, Alford Harris, was petitioner's half cousin, who was asked by petitioner's mother to become involved in the case. Attorney Harris testified that he agreed to help until a more experienced criminal attorney could be retained. Petitioner was informed that an attorney had arrived to speak with him. Petitioner stated that he did not hire an attorney and that he did not want or need an attorney. Lieutenant McDermott called the prosecutor, who advised that petitioner should be allowed to speak with the attorney. Petitioner then meet with the attorney for about 20 minutes. Attorney Harris then spoke with the officers and stated that he understood that petitioner had already

spoken with the officers and admitted involvement in the crime. Attorney Harris stated that he was looking for "a reduction and a walk." Lieutenant McDermott immediately responded "no," indicating that neither a reduction nor a walk was discussed with petitioner.

The officers indicated to attorney Harris that they would want a written statement and that they intended to continue verbal discussions. Attorney Harris then went back and spoke with petitioner for about 10 or 15 minutes. After attorney Harris left the building, the officers were informed that petitioner wished to speak with them.

Petitioner indicated that he wanted to continue to talk. Lieutenant McDermott asked petitioner for a written statement. Petitioner indicated that attorney Harris told petitioner to contact him before he made a written statement. Lieutenant McDermott telephoned attorney Harris, and told him that they had completed the verbal statement and at that point they wanted petitioner to make a written statement. Attorney Harris informed Lieutenant McDermott that he did not want petitioner to make a written statement at that point and that it would take a couple of days before he could sit down with petitioner and decide whether a written statement would be given. Lieutenant McDermott advised petitioner what attorney Harris had stated, indicating that attorney Harris did not want petitioner to make a written statement. Lieutenant McDermott asked petitioner if it would be all right if the officers wrote down what petitioner had stated verbally. Petitioner agreed to that procedure. The interview was completed at 2:00 a.m.

Sergeant Goralski wrote out an 11 page statement based upon what petitioner told the officers. Petitioner signed the statement after making corrections. Petitioner testified that attorney Harris never instructed petitioner not to talk with the officers. Petitioner stated that he was fed once

in eight hours and did not sleep. Petitioner felt that if he cooperated he would not have to go to jail and that he was negotiating a deal and would be rewarded if he testified against his co-defendant.

The trial court judge denied petitioner's motion to suppress the evidence, explaining:

> There's no question that the defendant is a sophisticated individual who has been previously advised of his Miranda Rights. There's no question that he was advised of those rights in this particular case. Not only was he advised of them, he, in fact, knew them and exercised them.
>
> As far as his – whether or not he was abused or what have you, there was no – in fact, the attorney indicated that he had not – he said he was doing all right. Even the defendant said that they provided him food. There's no evidence of any deprivation of food, bathroom privileges, et cetera, and that is necessarily not an issue.
>
> Then you have actually the attorney intervention in this particular case which is a very significant factor. The attorney testimony, in fact, was some of the most damaging testimony as it relates to this other than the statements made by the defendant.
>
> And although Mr. Baker asked the court to discount the testimony of – because he refused to answer questions, the court takes this into consideration when assessing his credibility and does so, especially when it gets to the issues of whether he was promised a walk or what have you. When somebody refuses to answer, only wants to offer responses to one-half of the questions but refuses to answer other halves of questions although put on the stand, it's readily apparent that that becomes self-serving testimony.
>
> But the defendant himself corroborated much of what Mr. – Lieutenant McDermott actually testified to. Lieutenant McDermott categorically denied making any promises in exchange for a statement. The defendant however says it was, but then when asked about the contents of the statement, he categorically refuses to answer any questions along those lines because obviously if this was a quid pro quo, as counsel has characterized it to be, then it would be in exchange for truthful statements, which the defendant refuses to acknowledge here in court.

But nonetheless, it is clear, based upon the testimony, that the defendant not only knew but was advised and still proceeded, contrary to counsel's advice, to give a statement, an oral statement that was transcribed by counsel and then adopted by the defendant through his signature and initials.

As far as also any assertion of counsel, needs to be made by the defendant and needs to be clear and unequivocal, and that was not necessarily done by the defendant as it relates to this particular case. There is no clear and unequivocal assertion of counsel as it relates to the statement itself, and in the absence, the police can construe that to be a waiver of Sixth Amendment Right under the facts and circumstances of this case.

The – let me go through my notes. And also the defendant admitted in his testimony that he – he was the one who initiated contacts with the defendant – or with the detectives, again, which, in essence, corroborates Lieutenant McDermott's testimony, although the defendant claims that the reason or the basis for this was this purported deal which would – but having had the opportunity to assess the credibility of the witnesses and analyze their credibility, the court simply does not necessarily believe the testimony of the defendant as it relates to that.

However, the defendant does significantly indicate that despite his prior warning by his attorney/cousin, that he was the one who reinitiated and, one, the refusal to answer questions about whether or not the statement was truthful in exchange for a reduction of responsibility and then to say, well, you know, I didn't hear everything my cousin was saying, I just didn't – I wasn't overwhelmingly convinced of the veracity of those statements made by the defendant.

Consequently, for those reasons, based upon the evidence presented, based upon the ability to assess the character and credibility of this witnesses, the court finds that there was no violation of the Fifth and/or Sixth Amendment Right to Counsel as it relates to the statement, and the motion to suppress the statement based upon a violation of either Fifth or Sixth Amendment Right to Counsel is denied based upon the precedent cited by this court.

Clearly, petitioner understood his rights and made a voluntary statement knowing that he could remain silent and have an attorney present while making his statements to the officers. The Michigan Court of Appeals' decision did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or result in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

In summary, the undersigned concludes that petitioner's claims are without merit and therefore recommends that this Court dismiss the petition with prejudice.

In addition, if petitioner should choose to appeal this action, I recommend that a certificate of appealability be denied as to each issue raised by petitioner in this application for habeas corpus relief. Under 28 U.S.C. § 2253(c)(2), the court must determine whether a certificate of appealability should be granted. A certificate should issue if petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, the undersigned has examined each of Petitioner's claims under the *Slack* standard.

Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." The undersigned concludes that reasonable jurists could

not find that a dismissal of each of Petitioner's claims was debatable or wrong. Therefore, the undersigned recommends that the court deny Petitioner a certificate of appealability.

NOTICE TO PARTIES: Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b). Failure to file timely objections constitutes a waiver of any further right to appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985).

      /s/ Timothy P. Greeley  
      TIMOTHY P. GREELEY  
      UNITED STATES MAGISTRATE JUDGE

Dated: July 31, 2009